We have five cases on the calendar this morning. A case from the Court of International Trade in New York, three patent cases, one from the PTO and two from district courts, and a case from the Merit Systems Protection Board that's been submitted only on the briefs and will therefore not be argued. The first case is Changzhou Flooring et al. v. United States, 2015, 1899. Mr. Grimson, when you're ready. Good morning, and may it please the Court. Jeffrey Grimson for Appellant Fine Furniture. I'm presenting argument as well for the other eight appellants. In the anti-dumping case on multi-layered wood flooring, Commerce chose three companies from among a pool of Chinese exporters who answered the quantity and value questionnaire to be representative of that group. Yet when those three companies got zero dumping margins, Commerce refused to apply the average of those under Congress's expected method to the other cooperating companies. Commerce justified its refusal to apply the zeros to the non-selected cooperating companies on two bases, both of which must be rejected. First, Commerce looked to a later time period when Commerce conducted an administrative review of some of the eight appellants and found above de minimis margins. I will discuss this later, but the Albemarle Court considered the same logic and rejected it. This case has been up and down with the CIP, CIT, and Commerce three or four times. There have been five decisions of the trade court on this case, including some related to one consolidated plaintiff who, in fact, during the litigation, got a zero dumping margin and was therefore excluded from the anti-dumping order. Didn't they finally get it right? They did not finally get it right. What they finally decided is that if you start an anti-dumping case against China, and under Commerce's methodology, they presume that all of China is one entity, that's a rebuttable presumption, and companies have to go forward to the Commerce Department saying, we are not part of the Chinese government. We're entitled to a separate rate. Commerce filed this normal process at the beginning of the case, but they still have to decide who to examine to determine dumping margins, so they send out quantity and value questionnaires and they make them available as well in the Federal Register. We don't know that in this case, whether the three that were selected have volumes representing a majority of the merchandise at issue, unlike in Albemarle. I assume your view is that doesn't matter, but I'm just asking a factual question. As a factual question, we know nothing about the 110 companies who didn't answer, but we know the one thing that does matter, and that is, under the law and under Commerce's view of Chinese cases, those 110 companies are the Chinese government. They are the PRC-wide entity. They will never get the result of the expected method, and Commerce is trying to say, we've got the 80 companies here who came forward and proved they are not part of the 110. These 80 companies, we selected three. They all got zeros, and the expected method and the whole idea of representativeness is what should be the rate you apply to the others in the 80 companies? I'm not quite hearing the answer to the question I'm trying to ask. Forget about the China-wide entity. You focused just on, what is it, the 79 companies that responded, and is that the number that was found to be independent of the? Throughout the course of the case, the number has gone from 79 to 81, depending on who. That doesn't matter. There are the companies that answered, 79 to 81, and there are the companies that did not answer, the 110. Right, and how many of the 79 were found to have justified, shown independence from the Chinese government? All of them. All of them. Minus maybe three. Looking at just that group, do we know whether the three mandatory respondents, the ones selected for individual investigation, represent in the volume that they sent into the U.S., a majority of what was sent into the U.S., or not? We know that Commerce chose them because they were the biggest. That doesn't answer the question. No, we don't know that they were the majority. We don't know their majority, but Commerce is sampling. I understand perfectly well that the better reading, in your view, of Albemarle, is that it doesn't matter whether they're the majority, that anything that satisfies the two conditions for using either sampling or the largest number means there's a congressionally established presumption of representativeness and they have to rebut it, and they didn't. That's correct, and under Commerce's sampling statute, they can either do statistical sampling, which it did not do in this case, or, Congress says, pick the respondents representing the largest volume until you reach the point that it's not practicable to continue choosing more. Remember, Commerce starts out all this. The law and the WTO says you're supposed to examine every company individually, but Commerce says, no, we do not have resources to do that. Commerce gave them the authority to select a smaller number, including the largest volume, which is the specified language, and Commerce did that in this case. They picked three companies who were perfectly representative, so long as they were dumpers. Once they drop below a de minimis, then suddenly Commerce has a lot of questions about whether they represent the whole industry, and they make many inferences about these 110 companies, but I would just emphasize again that the representativeness of the average that you're seeking here should be representative to those who are going to get it, not the 110 who are not. We understand your albemarle argument, but could you explain what do you think Commerce should have done back at the time when it had the information from the three mandatory respondents and realized that there were over 100 exporters that hadn't responded and they had a suspicion that many of them, or at least some of them, could have potentially become a mandatory respondent if they had responded, and so therefore that would have resulted in a separate rate above de minimis. At that time, if they felt convinced or suspicious that a de minimis separate rate wouldn't really represent the separate respondent's economic reality, what should have Commerce have done more than what it did, which was rely on a set of inferences? Well, this is a frustrating point because they didn't raise this inference until the margins dropped to zero. Put the inferences aside. What should Commerce have done? They already declared these 110 companies as part of the China-wide entity. They weren't going to get a rate. Commerce stopped caring about them early. I guess the question is if we follow albemarle, the requirement would be that Commerce has to come up with some evidence that shows why the separate rate should be different from the calculated rate from the mandatory respondents. I'm asking you what are some examples of what that evidence is or should be? I can't think of evidence that they would gather from the 110 companies who had already refused to cooperate in the case, so it's truly a hypothetical that would never occur, and it happens in every Chinese case that there are entities that don't answer. It can't be the test that you get to the end of a case if there's zero. Let's start with a different hypothetical. Let's say there's 400 exporters, and then Commerce sends out the Q&V questionnaires to all 400 and gets back 10 responses. From the 10, they pick three mandatory respondents, and then let's say they're all de minimis. Under those kinds of skewed circumstances where there's 390 other exporters out there that didn't respond, it seems a little much to assume that these three mandatory respondents that were chosen truly are the three largest exporters when you can't possibly know that when there's 390 out there. The purpose of the expected method is to find the margin that applies to those within the pool that you're going to apply to. I guess what I would say is if Commerce said, everybody who shows up in this room today through council and gives a quantity of value, we're going to select from those companies, the largest, and they do so, those three get zeros. We don't care about companies that never made it through the door because they're not going to get the expected method. They're not going to get any average calculated based on what Congress is asking them to do. Congress is not saying calculate the margin based on companies who can never get it. Think about representativeness in terms of companies who are deemed to be unrepresentative. Remember that the whole idea of separate rate companies is that these companies are, by law, separate from the 110 who didn't answer. They have nothing to do with them. Whatever those 110 companies are doing, it is part of the China-wide entity. This came up in the fine furniture argument about the PRC. Your position is if there's 100 companies that refuse to respond or 1,000 companies that refuse to respond, Commerce is stuck. It just has to follow the expected method. BestPack says when Commerce chooses a method, if there's later developed parts of the record that they would have wished they had more fully developed, they are still stuck with their method. Here, they're not stuck with the method. They're actually asked to follow the expected method. When Congress says they expect Commerce to follow this method, that is an albemarle sort of thing. But it's not a hard wire. If there's conditions where the expected method can be not followed, right? Those weren't present here. Albemarle said either you have to find that applying the method is not feasible. Commerce is not arguing that. It's very easy to apply zeros. They did it following this court's decision in Albemarle. Not feasible is just not on the table. The second is would the zeros be not reasonably representative of a potential dumping margin of the cooperating companies? Commerce has really flipped that standard here, and they've said there's a potential that they might have dumped. But if you look at the SAA, strictly speaking, it says no. The zeros, you have to find that the zero, the average can't be a potential dumping margin. Commerce has not ruled out that the companies couldn't have gotten a zero, nor could they when our client, Fine Furniture, gave a full response. They gave surrogate value data. Then going back to my hypothetical, what would be the evidence that Commerce, in your mind, would need to have in order to show that the separate rate respondents are not behaving the same way as the mandatory respondents? Well, I mean, Commerce struggled with this issue already in this case and found that there was nothing. I'm asking you a hypothetical. I don't think there is evidence that they can gather full responses from all the companies, but when our client actually gave them that, they said we can't consider it. We won't consider it. So we gave it all. We gave it all that you could possibly give. I'm sorry. I'm sorry. I'm not asking about your story. I'm asking a hypothetical about trying to understand in what circumstances would Commerce be able to get evidence that would then justify moving away from the expected method. It's obviously contemplated right in the SAA that there will be circumstances to that effect. I'm asking you what are the types of evidence that would justify that? Justify departing from the expected method? No. Well, Albemarle talked about in a review context, at least, you could have dramatic changes from one time period to another. We don't really have that here because we are in the context of an investigation, so there is no prior time period. This is the one time when the law says we're looking at your behavior and if you are not a non-dumper, if you aren't dumping, you're going to be excluded from this case from this point forward. Before your time runs out, Judge Toronto has a question. Yes, sir. This is not on the main question, the question we've been discussing. It's not even on the second fine furniture specific question about your own data. But on this point, I think you object to Commerce having said there's an above de minimis but not otherwise specified amount. I don't understand, maybe you can explain to me what the practical consequences of this dispute are. Well... Why does it matter if they say 7% versus 0% or it's more than 0% but we don't know how much? It's just an extension of the inferences that they're already making. If they're allowed to say we don't even need to calculate a number anymore, we think you might be above de minimis and that's the new standard. That can't be the standard and it can't be based on... I'm asking an enormously practical question. What happens differently if they say 0 or something above 0 but otherwise... A different deposit at the port? A different effect on the ultimate liquidation? What? I mean, I was thinking about this. This is outside the four corners of our briefs, I will say. But every year an importer has to apply for a continuous import bond. And the continuous import bond with customs is based on your imports during the past year times the duty that would apply. So these importers, when they go to apply for a surety bond, a customs bond, what number did they tell the surety? If they tell them we have a number that is unspecified and potentially infinite, then the surety is going to demand millions of dollars of secured customs bonds. That is not a point made in our briefs. The main point is that if commerce is allowed to just say, we don't have to do our job and calculate a margin, it's high. We know it's above 0 and that's all that matters. Then that's just giving them license to make the kinds of inferences that they've made here, which are rebutted by information on the record that they refuse to look at. Mr. Lipson, your time has expired, but we'll give you four minutes of rebuttal. Thank you very much. Ms. Hogan? Good morning, Your Honors. May it please the Court. Commerce's determination here, I'm sorry, the trial court's judgment here should be affirmed because commerce's determination here is supported by substantial evidence and consistent with the statute that it relies upon for guidance. To quickly answer Judge Toronto's question about the practical implications, at this point there really are none. All of the cash deposit rates have been superseded by the results of subsequent administrative reviews. That was in part one of the reasons why the trial court was affirmed, what commerce did here. The need for a specific number was lessened because those rates had been superseded by the results of the first administrative review. Does the point you're just making apply to the entirety of the case or just what I thought of as this little piece at the back end? That is, are you suggesting that because the rates, this is all in the investigation, right, the investigation, don't matter anymore, we don't need to think about whether there was any impropriety in the decision to not just use the expected method under the SAA initially? No, I'm not suggesting that the results of the investigation aren't still subject to judicial review. But just in terms of the practicality of why does it matter whether it's unspecified above the minimus margin versus a 1% rate. Okay, just that little issue. As this court, I want to first I guess address Albemarle because I think that's the case that the court will look at first. As this court held that in that particular case the individually examined respondents there did account for a majority of the market during the relevant period and this court concluded that they were representative at the very least in terms of aggregate volume. But the court's analysis, it mentioned, it observed that in fact there the three, I think it was, respondents had a majority of the market. But the statutory point it made was that if you look at the two alternatives Congress gives in 1677, F1, C2, for examining everybody individually, when you do either one of those Congress is conveying the idea they're representative. Now neither one of those depends on there being a majority. So I take it that the Albemarle statutory analysis is that if you fit under 1677, F1, C2, you have the presumption that the mandatory respondents are representative of the other separate rate respondents. And you need therefore to have an affirmative reason, commerce, to say here's why that's not true for this particular separate rate respondent. So it doesn't depend on the majority rationale. It doesn't, no, but the fact that in this case commerce didn't have those facts was a reason to depart from the expected method. So again, two of the reasons that this court in Albemarle said no, commerce really must follow the expected method in this circumstance was because there was factual reason to believe that they were in fact representative, that the rate was representative, but also because in the context of administrative reviews, there's a heightened requirement for contemporaneity. And so this court said it wasn't appropriate for commerce to look backwards to select a rate to assign to the separate rate respondents because the purpose of an administrative review is to look at the dumping behavior during that time period. The court distinguished that from an investigation in which the question is much broader. The question is simply is there dumping or is there not dumping? We're examining the pricing. The second part you're talking about, wasn't that part of the Albemarle opinion talking about whether the chosen method by commerce was reasonable, not whether it was appropriate to depart from the expected method? I mean, as I understand it, there were two pieces. One was, is it okay to depart from the expected method? And two, if so, was the method that they picked using a different review period data to compare, was that reasonable? And so as I understand it, what you're saying is the reason why we don't have to follow Albemarle, which seems to bring up a strong presumption of using the Albemarle opinion identified the three mandatory respondents as representing the majority of all exports, whereas here we don't have that. So is that what it boils down to? So if we disagree, I guess is what I'm really getting at, that that was really the linchpin of the presumption in Albemarle, then if we disagree with you on that, then we're bound by Albemarle. The linchpin of Albemarle and the holding of Albemarle is, I think we all agree, that commerce can't follow the first part of the statute because there are no rates that are either non-zero, non-de minimis, or based on AFA. When commerce goes to the second part of the statute and uses any reasonable method, that commerce is presumed to use the expected method unless one of those two exceptions apply. And the appellants are correct. We're not arguing that it would not have been feasible for commerce to do so. We're arguing that on the facts of this case, commerce found a reason why it should depart from the expected method. And that's primarily based on this large percentage of exporters and producers who didn't respond and who left a gap. Just tell me why the following is wrong. Albemarle says you need a reason to conclude that the separate rate firm is different from the presumptively representative mandatory respondents. The key difference between the separate rate firms and the 110 non-responding China-wide entity firms is that one responded and the other didn't. So it seems, I guess, upside down to me to say that the ones that didn't respond, presumably didn't respond because had they responded, they would have actually had a worrisomely high number, to imply that that inference carries over to the ones who did respond. So I'm not sure why what one would plausibly infer about the non-responders tells us why there is an unrepresentativeness within the group of responders. That doesn't apply to the, you have a separate point about look what happened in the first administrative review, but on this primary rationale or principle of use some word like that, that one doesn't seem to me to go to the central inquiry. Why are the three unrepresentative of the separate rate respondents who did, after all, respond? The answer is that the 110 companies that didn't respond, we just don't know. We don't know if they, so their failure to respond did two things. It's not necessarily that they would have been subject to a high or a punitive or an adverse rate. It's that they were assumed to not be capable of receiving either a zero or de minimis rate. That's the assumption that Commerce made. But their failure to respond affected the separate rate respondents in so far as it left a gap in the record about... If under Albemarle you actually have to have an affirmative basis for concluding that the three mandatory respondents were not representative of the however many separate rate respondents, 70 something, why is that an affirmative basis for inferring unrepresentativeness? I'm not quite seeing that. What Commerce found, this is JA102118 of the administrative record, is that looking only at the mandatory respondents' rates provides an incomplete picture. And that at page 102123 Commerce explained that failing to take into account the experience of... To look only at the three mandatory respondents would be to fail to take into account the experience of the vast majority of the companies who were subject to the investigation. So the answer, as best as I can explain it, is that we just don't know. And that was the factual record that Commerce was left with, was that it just didn't know what was going on in a large part of the market. And so it was more appropriate, Commerce found, to look at all of the potential producers and exporters as a whole in determining the economic reality of the separate rate respondents, that it was more varied than would just simply looking at the mandatory respondents suggest. Because, unlike Alamaro, Commerce didn't have the comfort to know that those three mandatory respondents were, in fact, representative. And Commerce corroborated that conclusion with reference to the results of the first administrative review in which there were respondents, in fact, fine furniture, who was determined to have a positive dumping margin. And that's both relevant and permissible for two reasons. One, although this court in Alamaro and in other contexts have not approved of Commerce looking backwards, when the issue is contemporaneity and there's a need for specificity during a particular time period, this court said it is not correct to look backward in the context of an administrative review. But in the context of an investigation, particularly where the time period for the first administrative review starts at the date of the preliminary affirmative determination, that is, while there's still an investigation going on, there is a closer connection between the investigation and the administrative review. And we also know that the discipline of an order... Can you just remind me, what is the overlap or disparity and overlap of the periods of the first administrative review and the period of investigation? The investigation period was between April and September of 2010. The preliminary affirmative determination of the investigation was issued in May 2011. And at that point, cash deposits were required to be made on subject merchandise. And then the time period for the first administrative review runs from that date, from May 26, 2011, through November 30, 2012. So there is a several-month sort of overlap between when companies are at least preliminarily subject to cash deposits while the investigation concludes after there's been a preliminary affirmative determination going through to the end of the... And the first administrative review... Maybe you can clarify how this works. The positive dumping margin determined there, is that some kind of... Does it take account of the whole period so that it is at least possible that there was none during the overlap period with the investigation period but offsetting more later? I don't... That's possible. Okay. Yes, that's possible. But as we explained, there's reason to think that if there was dumping occurring or unfair pricing behavior occurring during the first administrative review, one might expect that the imposition of cash deposits and potentially being subject to the discipline of an anti-dumping duty order would tend to affect or to dampen... And is that point... I noticed you didn't cite anything for that. Is that something that's empirically grounded or kind of plausible armchair economics grounded? Probably the latter. The trial court does acknowledge that point, but we weren't able to identify another case where the court has said that before. This usage of the data from the first administrative review in this case, it's merely to corroborate, right? Correct. So if hypothetically we were to disagree that the lack of response from the non-responding respondents represents substantial evidence to overcome the presumption that the separate respondents should be treated the same way as the mandatory respondents, then we wouldn't need to reach the question of whether it was appropriate for Commerce to then corroborate its findings by relying on data from a different period of time compared to the investigation period. Is that right? Presumably if the court finds that it lacks substantial evidence, then that question isn't before the court. Because the point is it's just being used for corroboration. It's not the actual substantial evidence that's required. Correct. Okay. And then we likewise wouldn't need to reach this whole question of whether an unspecified rate that's above de minimis is appropriate or inappropriate, because we would have essentially vacated that. Right. I mean, if the court were to find that Commerce was obligated to follow the expected method and that it couldn't depart from that, then I think that would resolve the question. Yes. Thank you, Ms. Hogan. Thank you, Your Honor. Mr. Grimson, we'll give him his four minutes back. Thank you, Your Honor. Judge Taranto, I just want to make sure that on your question about the meaning of above de minimis that we're clear about one point, which is that if our eight appellants are found to have a zero margin, they are retroactively excluded from this dumping order ab initio, which means that all these subsequent reviews, we all have court injunctions that are protecting our imports. All these subsequent reviews will be wiped clean, and our clients have deposited tens of millions of dollars of duties too much during that whole time. We're in the fifth review. We started the fifth administrative review, and our clients are still in this case. It means a lot to get a zero, to get a de minimis, which is below 2% in an investigation. It means a lot. It's the one time that you are either found to be a dumper or not. So if you've got a zero in the investigation in this- If you've got the lucky ticket to be selected- Right. What happens retroactively- You are excluded. From the first five administrative reviews? That's right. Yep. That's what it means. Commerce can never pull you back in in a subsequent review? The petitioners have to file a new dumping case because we're fair traders, just like the three who are representative of the appellants here. And I would say that reliance on the first administrative review is particularly inappropriate in this case because of a couple of reasons. Number one, the court already looked, I would say, askance at jumping around time periods in Albemarle. And the home writing case, which I argued in front of Judge Toronto and Judge Chen and lost, you upheld the government wanting to stick within the period. But here they want to go outside that period. Well, what happens when you go outside that period? In the first review, Commerce came up with a new reduction from a U.S. price of 8% VAT off the top. That means 8% is being added on to dumping margins in the first review that wasn't part of the calculation in the investigation. Our client got a 5.92% fine furniture. Leo, a company who Commerce did exclude in this case through the course of the litigation, got a higher margin than fine furniture in the preliminary result. The one moment when you had a direct side-by-side comparison between a company that Commerce said was a fair trader and fine furniture, our client, we had a lower dumping margin than them. We gave a full dumping margin during the investigation, showing we were not dumping. All this inference about what might have happened, what might 110 companies, they don't represent a large percentage of exporters. They are a number of 110. We don't know that that means it's a big number. It might have only shipped plywood, which comes under these same HTS codes and says I'm not going to answer a questionnaire on flooring. Commerce says that they are the vast majority. That might be based on a count of number of companies, but there's no volume information. The Albemarle case, we actually considered and rejected this. Here on page 1353 of Albemarle. The government argues that, quote, the possibility exists that the pricing behavior of the largest exporters selected for individual examination may not reflect the pricing behavior of smaller exporters. But there is no evidence here that the largest exporters are not representative. They have given you nothing here other than speculation. They are refusing to look at evidence that's right in front of them. You ask what Commerce could have done. Could they have asked for more information from the separate rate companies? Commerce has answered that question. They've said no. You know how they answered that? There's a company standing here, me representing them, who gave every last living thing you could give in this case, including a calculation using the surrogate values that the CIT approved that the three companies got zeros. It also showed that our client, during the time you care about, got a zero. So I'd ask the court to remand this case, reverse it, like you did in Albemarle, and apply the expected method for the companies, the eight appellants before you today. Thank you very much. Thank you, counsel. We'll take the case under advisement.